OPINION OF THE COURT
 

 Rosenblatt, J.
 

 In this combined opinion we interpret the notice of claim conditions for supplementary underinsured motorist insurance coverage — known colloquially as “underinsurance” — in two automobile insurance policies. In both cases, the insurance carrier disclaimed coverage, asserting that the policyholders did not furnish timely notice of the claim.
 

 The DiGioacchino/Nationwide Claim
 

 Luigi DiGioacchino’s claim for underinsurance benefits stems from his automobile accident with another car, driven by Michael Frasier and owned by Kellie Jerome, in December 1994. At the time of the accident, DiGioacchino had a policy with Nationwide Insurance Company that contained provisions for first-party (no-fault) benefits as well as underinsurance benefits. Immediately after the accident, DiGioacchino notified Nationwide of his claim for first-party no-fault benefits. Nationwide was also the carrier for the Jerome/Frasier vehicle. The Nationwide policy contained no specific time limit, but required that written notice of claims for underinsurance benefits be filed with Nationwide “[a]s soon as practicable.”
 

 In January 1996, DiGioacchino commenced a personal injury action against Jerome and Frasier. Shortly before a deposition
 
 *491
 
 scheduled to begin in early October 1996, the defendants in the personal injury action notified DiGioacchino’s attorney that they wished to settle the action. Upon receipt of the settlement offer on October 23, 1996, DiGioacchino’s attorney learned that the Jerome/Frasier policy had only $25,000 in coverage, and the following day filed a claim for underinsurance benefits under the Nationwide policy.
 

 Nationwide disclaimed coverage, asserting that DiGioacchino had not filed notice “[a]s soon as practicable.” DiGioacchino then served Nationwide with a demand for arbitration. Nationwide resisted, bringing a proceeding in Supreme Court for a permanent stay of arbitration. DiGioacchino argued that Nationwide had notice of the claim because it had insured both parties to the accident and Nationwide had already paid him no-fault benefits under the policy.
 
 [1]
 
 Supreme Court granted the stay of arbitration and the Appellate Division affirmed.
 

 The Mancuso/Metropolitan Claim
 

 Dominic Mancuso’s claim for underinsurance benefits stems from his automobile accident involving another car, driven by Leo Charbonneau, in May 1993. At the time of the accident Mancuso had an automobile insurance policy with Metropolitan Property and Casualty Insurance Company that contained provisions for first-party (no-fault) benefits as well as underinsurance benefits. Immediately after the accident Mancuso notified Metropolitan of his claim for first-party no-fault benefits. Another clause in the insurance policy, however, required that written notice of a claim for underinsurance benefits be filed with Metropolitan “[w]ithin 90 days or as soon as practicable.” It did not say 90 days from when.
 

 In March 1995, Mancuso commenced a personal injury action against Charbonnéau. It was not until May 30, 1996, however, that Mancuso learned of the $25,000 coverage limit of the Charbonneau policy, when Charbonneau’s carrier tendered the full policy amount. Six days later he filed a notice of claim for underinsurance benefits under his own policy with Metropolitan.
 

 Metropolitan disclaimed coverage, relying on the policy’s condition that notice of claims be given “[w]ithin 90 days or as soon as practicable.” Mancuso subsequently served Metropolitan with a demand for arbitration. Metropolitan then brought
 
 *492
 
 a proceeding in Supreme Court for a permanent stay of arbitration. Supreme Court construed the policy’s “90 days or as soon as practicable” notice condition as meaning 90 days from the date of the accident, rather than, as Mancuso urged, 90 days from when he discovered that Charbonneau was underinsured. Using the accident date criterion, the court held and the Appellate Division agreed that Mancuso did not act “as soon as practicable” after the lapse of 90 days following the accident, and rejected Mancuso’s claim that he gave timely notice by making his claim six days after he discovered that Charbonneau was underinsured.
 

 I
 

 Underinsurance coverage is designed to increase the level of protection afforded to policyholders injured by negligent drivers who lack adequate liability insurance. Typically, an underinsurance claim arises when a tortfeasor has insurance that satisfies the minimum legal requirements but is insufficient to provide full compensation to the injured claimant
 
 (see,
 
 Note,
 
 Uninsured Motorist Coverage in Virginia: The Scope of Protection and the New Underinsurance Provisions,
 
 69 Va L Rev 355, 356 [1983];
 
 see also,
 
 Note,
 
 Uninsured Motorist Coverage Laws: The Problem of the Underinsured Motorist,
 
 55 Notre Dame L Rev 541, 543-544 [1980]; 9 Russ and Segalla, Couch on Insurance 3rd § 122:3).
 

 Insurance Law § 3420 (f) (2) was enacted to allow policyholders to acquire the same level of protection for themselves and their passengers as they purchased to protect themselves against liability to others (Mem of State Executive Dept. 1977 McKinney’s Session Laws of NY, at 2445, 2446;
 
 see also, Matter of Prudential Prop. & Cas. Co. v Szeli,
 
 83 NY2d 681, 685-686).
 

 As with other types of insurance, underinsurance coverage involves notice provisions that are conditions precedent to the carrier’s liability
 
 (White v City of New York,
 
 81 NY2d 955, 957;
 
 Security Mut. Ins. Co. v Acker-Fitzsimons Corp.,
 
 31 NY2d 436, 440). In cases of underinsurance coverage, however, questions as to compliance with notice provisions have proven particularly troublesome.
 

 Insurance coverage for risks such as fire, theft, death, and primary liability will typically materialize instantly and unambiguously upon the occurrence of a single event. Usually, the point at which a claim ripens is readily discernible, and the timeliness of a notice of claim therefore has reference to a
 
 *493
 
 single occurrence
 
 (see, e.g., Security Mut. Ins. Co. v Acker-Fitzsimons Corp.,
 
 31 NY2d 436, 439, supra;
 
 see generally,
 
 9 Russ and Segalla, Couch on Insurance 3rd §§ 126:25-126:31).
 

 A claim for underinsurance benefits, however, has a number of conditions along the way. The accident is obviously the first event, considering that if there is no accident, there can be no underinsurance claim. Nevertheless, an accident and a tortfeasor, without more, does not give rise to an underinsurance claim. There may be no such claim unless and until other conditions exist, including not only the injuries but also the insufficiency of the relevant tortfeasor coverage to compensate for them. In
 
 Matter of Prudential Prop. & Cas. Co. v Szeli
 
 (83 NY2d 681, 684,
 
 supra),
 
 this Court held that “underinsured motorist coverage is triggered when the limit of the insured’s bodily injury liability coverage is greater than the same coverage in the tortfeasor’s policy.” Even then, however, a claim for underinsurance need not be paid unless and until another “condition precedent” is met, notably that “ ‘the limits of liability of all bodily injury liability bonds or insurance policies applicable at the time of the accident shall be exhausted by payment of judgments or settlements’ ”
 
 (S’Dao v National Grange Mut. Ins. Co.,
 
 87 NY2d 853, 854 [quoting Insurance Law § 3420 (f) (2)]).
 

 Although in theory most automobile accidents carry a potential claim for underinsurance benefits, it takes time, investigation and analysis to determine whether one will actually result. In the assessment a number of factors come into play, including the seriousness and nature of the insured’s injuries
 
 (e.g., Matan v Nationwide Mut. Ins. Co.,
 
 243 AD2d 978), the potential liability of multiple parties
 
 (e.g., Matter of Allstate Ins. Co. v Sala,
 
 226 AD2d 172) and of course the extent of a tortfeasor’s coverage
 
 (e.g., S’Dao v National Grange Mut. Ins. Co.,
 
 87 NY2d 853,
 
 supra).
 
 Because these factors will vary from case to case, so too will the time at which an underinsurance claim becomes reasonably ascertainable. Thus, although coverage is “triggered” when the limit of the insured’s bodily injury coverage is greater than the same coverage in the tortfeasor’s policy, the acquisition of this information, the existence of other conditions and the occurrence of other developments do not always take place at a fixed time.
 

 It is against this background that we examine the timeliness of the claims for underinsurance in the two policies before us.
 

 
 *494
 
 II
 

 The Nationwide Policy
 

 This policy required that the notice of claim for underinsurance benefits be filed “as soon as practicable.” That, we note, is the very language used by the New York Insurance Department in its standard form of endorsement (11 NYCRR 60-2.3) set forth in Regulation 35-D (see, 11 NYCRR subpart 60-2
 
 et seq.).
 

 [2]
 

 Indeed, the phrase “as soon as practicable” has been commonly used in insurance policies and has a long history of judicial interpretation and application.
 

 By its very nature the standard contemplates elasticity and a case-by-case inquiry as to whether the timeliness of the notice was reasonable, taking all of the circumstances into account
 
 (Deso v London & Lancashire Indem. Co.,
 
 3 NY2d 127, 129-130). In
 
 Mighty Midgets v Centennial Ins. Co.
 
 (47 NY2d 12,19) this Court in defining the phrase “as soon as practicable” stated that “[b]y no means does it connote an ironbound requirement that notice be ‘immediate’ or even ‘prompt’, relative as even those concepts often are;” but that it calls for a determination based on the facts and circumstances particular to each case. One commentator explains that “such clauses do not require instantaneous notice, but rather call for notice to be given with reasonable dispatch, in view of all the facts and circumstances of each particular case” (8 Appleman, Insurance Law and Practice § 4734, at 35 [1981]).
 

 A good deal of the litigation surrounding the phrase “as soon as practicable” involves an inquiry into whether a liability policyholder notified the carrier of an occurrence that might give rise to a claim by a third person against the policyholder (e.g.,
 
 Security Mut. Ins. Co. v Acker-Fitzsimons Corp.,
 
 31 NY2d 436,
 
 supra; Matter of State Farm Mut. Auto. Ins. Co. v Adams,
 
 259 AD2d 551;
 
 United Talmudical Academy v Cigna Prop. & Cas. Co.,
 
 253 AD2d 423). These cases are useful to the extent that they deal with the reasonableness of excuses in general. They are not directly controlling, however, because underinsurance has unique conditions and features for the ripening of claims that do not exist in primary insurance cases. Indeed, underinsurance analyses are intensely fact specific and therefore particularly well suited for determina
 
 *495
 
 tions of timeliness of notice on a case-by-case basis
 
 (see, e.g., Matan v Nationwide Mut. Ins. Co.,
 
 243 AD2d 978,
 
 supra
 
 [delay excused due to subsequent discovery of more serious injuries than originally known];
 
 Matter of Travelers Ins. Co. [DeLosh],
 
 249 AD2d 924 [same];
 
 Matter of Nationwide Mut. Ins. Co. [Fennimore],
 
 201 AD2d 979 [delay excused upon a showing of a “reasonable excuse” and “due diligence in ascertaining the policy limits of the vehicles involved in the collision”];
 
 Matter of Allstate Ins. Co. v Sala,
 
 226 AD2d 172,
 
 supra
 
 [delay excused due to time spent at trial to apportion culpability]).
 

 In interpreting the phrase “as soon as practicable” in the underinsurance context we hold that the insured must give notice with reasonable promptness after the insured knew or should reasonably have known
 
 [3]
 
 that the tortfeasor was under-insured. We contemplate an objective standard as to what constitutes reasonable ascertainment.
 

 The test, however, does not lend itself to mathematic precision. What may be swiftly ascertained in one case may prove difficult and protracted in another. In some instances injuries may manifest themselves immediately; in others, there may be latency. There are also variables in connection with the parties. Sometimes they may be easily identified, located and counted; sometimes not. An underinsurance claim will also turn on the respective levels of policy coverage and degrees of fault of the parties. This assessment may be straightforward and predictable, or it may be elusive or even surprising. Courts will determine whether notice was given as soon as practicable based on circumstances and factors they consider relevant to that determination.
 

 In this context we note that in determining the extent of the tortfeasor’s coverage, the Legislature in 1997 specifically amended Insurance Law § 3420 to address this issue (L 1997, ch 547). Now, as amended, Insurance Law § 3420 (f) (2) (A) requires carriers to disclose insurance policy coverage limits within 45 days after a written request by any person seeking damages who is also covered by his or her own underinsurance insurance. In addition, the time for an insured to make a claim for únderinsurance benefits is “tolled during the period the insurer of any other owner or operator of another motor vehicle that may be liable for damages to the insured, fails to so disclose its coverage” (Insurance Law § 3420 [f] [2] [A]). The avail
 
 *496
 
 ability of this remedy may be taken as a relevant factor in evaluating the timeliness of an insured’s notice of claim.
 

 In the case before us, the accident occurred on December 21, 1994. After having proclaimed his injuries as “serious” DiGioacchino commenced his action on January 15, 1996. Approximately 10 months later, in connection with a settlement offer, he came to learn the limits of the tortfeasor’s policy and at that point furnished notice to the carrier. The courts below concluded from these circumstances that the insured did not give notice of an underinsurance claim “as soon as practicable.” We cannot say they erred as a matter of law.
 

 III
 

 The Metropolitan Policy
 

 This policy contains a provision obligating the insured to give Metropolitan written notice of an underinsurance- claim “[w]ithin 90 days or as soon as practicable.” It does not, however, indicate from what date or event the 90 days is to be measured. In an underinsurance setting, this provision is a model of ambiguity. The courts below, agreeing with the carrier, interpreted the clause to mean 90 days from the date of the accident. That is an eminently plausible interpretation, but it is not the only plausible interpretation. The plaintiff argues that he acted well within the 90-day period (i.e., in six days) if the starting point is measured from the date he actually
 
 learned
 
 that the tortfeasor was underinsured. The courts have differed in interpreting this provision.
 

 In
 
 Matter of Travelers Ins. Co. v Morzello
 
 (221 AD2d 291, 292) the court was confronted with the same language in which the 90-day period, as here, was an abstraction untied to any particular event. It concluded that the 90-day notice period should be marked not from the accident date but from the date the insured “knew or should have known that [the tortfeasor] was underinsured with respect to his claim”
 
 (see also, Owen v Allstate Ins. Co.,
 
 250 AD2d 1018). In
 
 Matter of Travelers Ins. Co. (Dauria)
 
 (224 AD2d 259) the court took the relevant starting point to be when the insured “was apprised” of the tortfeasor’s underinsurance. In
 
 Matan v Nationwide Mut. Ins. Co.
 
 (243 AD2d 978, 979,
 
 supra),
 
 the court suggested another starting point when it identified the insured’s “founded suspicion” of his underinsurance claim and in
 
 Matter of Allstate Ins. Co. v Sala
 
 (226 AD2d 172,
 
 supra)
 
 the court held that the insured did not have a viable claim — and hence no duty to give notice of
 
 *497
 
 one — until after the jury had sorted out who was to blame and thereby established the underinsured status of the tortfeasor who was liable
 
 (see also, Matter of Travelers Ins. [Torres],
 
 245 AD2d 82, 83).
 

 That sophisticated Judges have varied widely in their interpretation of this 90-day language further satisfies us of its ambiguous character. Thus, we will apply a well-established rule of construction of insurance contracts. When an insurance carrier drafts an ambiguously worded provision and attempts to limit its liability by relying on it, we will construe the language against the carrier
 
 (see, e.g., Breed v Insurance Co.,
 
 46 NY2d 351, 353;
 
 Sincoff v Liberty Mut. Fire Ins. Co.,
 
 11 NY2d 386, 390; 2 Russ and Segalla, Couch on Insurance 3rd § 22:14; 7 Jaeger, Williston on Contracts § 900 [3d ed 1963]).
 

 We therefore reject the carrier’s interpretation — with which Supreme Court and the Appellate Division agreed — that the contested 90-day language be interpreted to mean 90 days from the date of the accident. We will construe the language in a manner more favorable to the insured. By phrasing the clause in the disjunctive, Metropolitan created a further ambiguity, leaving the language open to an interpretation that the period is measured from 90 days after the accident or as soon as practicable, whichever is
 
 shorter.
 
 We will assign it the other interpretation, and construe it as allowing Mancuso to file a claim 90 days or as soon as practicable (whichever is longer) from the date that he knew or should reasonably have known that Charbonneau was underinsured.
 
 [4]
 
 Even under this standard Mancuso’s claim fails.
 

 Under the facts as found by the lower courts Mancuso should reasonably have known of his underinsurance claim well before he gave notice of it on June 5, 1996. He filed the claim 14 months after he began his personal injury action and three years after the accident. If the delay were less extensive we would remit the case for a calculation as to when the claim was reasonably ascertainable. On this record, however, no matter how calculated, the timeliness of the notice of Mancuso’s underinsurance claim was unreasonable as a matter of law.
 

 
 *498
 
 Accordingly, in
 
 Nationwide
 
 and in
 
 Metropolitan,
 
 the orders of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 In each case: order affirmed, with costs.
 

 [1]
 

 . DiGioacchino also argued that he had unsuccessfully asked Nationwide for the liable tortfeasor’s insurance coverage limits. The courts below, however, found these assertions vague and unsubstantiated.
 

 [2]
 

 . The Insurance Department promulgated Regulation 35-D “in light of ensuing judicial rulings and experience” to “eliminate ambiguity, minimize confusion and maximize [underinsurance] utility” (11 NYCRR 60-2.0 [c]).
 

 [3]
 

 . The phrase “knew or should reasonably have known” when used here and elsewhere in this opinion should be interpreted as whichever occurs first.
 

 [4]
 

 . We will not, however, go so far as to interpret the clause to mean 90 days from the date the insured actually learned of his tortfeasor’s underinsured status
 
 (cf., Matter of Travelers Ins. Co. [Dauria],
 
 224 AD2d 259,
 
 supra).
 
 That interpretation would be too extreme and would create an open ended standard dependent entirely on subjective knowledge and idiosyncratic behavior, putting a premium on happenstance, delay and even indolence.