OPINION OF THE COURT
Joan B. Lefkowitz, J.
Petitioner insurer moves to stay arbitration of an underinsur *561 anee claim. On December 19, 1997, the respondent insured was operating her motor vehicle when it was struck by an automobile driven by Maureen Dulak, owned by Kevin Dulak. The respondent retained counsel in April 1998. On December 19, 1997, the petitioner received notice of a no-fault claim and assigned a claim number. Petitioner had issued a motor vehicle liability insurance policy to respondent. The record reveals that the liability bodily limits coverage and the supplementary motorist insurance (SUM or underinsurance) coverage are both $250,000/500,000.
Respondent’s counsel attempted orally and in writing (on May 8, 1998) to ascertain the Dulaks’ insurance coverage but received no response. On July 2, 1998, respondent commenced an action in the Supreme Court, Rockland County, against the Dulaks to recover damages for her personal injuries.
The Dulaks appeared in the action by counsel. Respondent’s attorneys served a discovery notice on October 6, 1998, which sought the insurance policy coverage and limits. In December 1998, respondent’s counsel requested a preliminary conference. A preliminary conference order was issued February 11, 1999 which, inter alia, directed responses to discovery demands within 45 days. On April 16, 1999, respondent’s counsel wrote to defense counsel advising him that he was in violation of the discovery order and again requested responses to the discovery demands. On April 20, 1999, the Dulaks’ insurer advised respondent’s counsel in writing that the policy limits were $100,000/300,000. Clearly, the $100,000 per person coverage is below the liability bodily limits coverage respondent has with petitioner.
Rather than give notice of intention to make an underinsurance claim, respondent’s counsel on May 13, 1999 again wrote to defense counsel seeking responses to the discovery demands. Six days later defense counsel responded and said that as to insurance policies and coverage same will be provided by the Dulaks’ insurer.
The underlying action was scheduled for trial on October 2, 2000. Respondent’s counsel wrote to the Dulaks’ insurer on September 11, 2000 requesting written confirmation of the $100,000/300,000 liability coverage (previously given in writing on April 20, 1999) and “excess coverage.” Respondent’s counsel again requested the excess coverage information from the Dulaks’ insurer on September 13, 2000. On the same date, respondent’s counsel wrote to the petitioner, enclosed copies of the pleadings in the underlying action, noted the Dulaks’ li *562 ability coverage of $100,000 and the potential for an underinsurance claim which awaited a response concerning excess insurance.
On September 15, 2000, the Dulaks’ insurer offered to settle respondent’s claim for the policy limit of $100,000. Four days later, petitioner denied the potential underinsurance claim for failure to give notice as soon as practicable. Again, on September 26, 2000, respondent’s counsel wrote to the Dulaks’ insurer for information concerning excess coverage. On that day, respondent’s counsel also wrote to petitioner explaining the circumstances concerning the underinsurance claim and also requesting petitioner’s consent to the $100,000 settlement without prejudice to petitioner’s position on the underinsurance claim. On October 4, 2000, petitioner wrote to respondent’s counsel confirming denial of the underinsurance claim and consenting to the settlement without prejudice to its defenses on the underinsurance claim.
On October 12, 2000, defense counsel sent respondent’s attorney two affidavits from the Dulaks which revealed that no excess coverage existed. Thereafter, respondent served a demand for arbitration on the underinsurance claim. Petitioner has commenced this special proceeding to stay arbitration.
Petitioner contends that a stay must be granted on one or two grounds: (1) the failure to make an underinsurance claim “as soon as practicable” as required by condition 2 of the SUM endorsement and (2) the failure to timely notify it of the underlying lawsuit. Respondent argues that her counsel was diligent in the attempt to ascertain the tortfeasor’s coverage and gave notice of the claim as soon as was practicable under the circumstances. The opposing papers do not address petitioner’s second argument.
Taking the arguments in inverse order, it is clear that respondent did not comply with the policy provisions to advise the petitioner of her lawsuit and to forward relevant papers “immediately” to the insurer (SUM endorsement [11 NYCRR 60-2.3 (f)], condition 4.) Nevertheless, this ground is not available to the petitioner who failed to cite it as a basis in the denial letter. (General Acc. Ins. Group v Cirucci, 46 NY2d 862 [1979]; Mutual Redevelopment Houses v Greater N. Y. Mut. Ins. Co., 204 AD2d 145 [1st Dept 1994].)
Addressing the remaining argument requires a full discussion. Underinsurance is triggered where the bodily limits of liability coverage of the tortfeasor’s vehicle is less than the bodily limit coverage of the insured. (Matter of Allstate Ins. Co. v *563 DeMorato, 262 AD2d 557 [2d Dept 1999]; Matter of State Farm Mut. Auto. Ins. Co. v Roth, 206 AD2d 376 [2d Dept 1994]; Insurance Law § 3420 [f] [2] [A].) The Court of Appeals has stated it thusly: “Under Insurance Law § 3420 (f) (2), an insured’s supplementary underinsured motorist coverage is triggered when the limit of the insured’s bodily injury liability coverage is greater than the same coverage in the tortfeasor’s policy.” (Matter of Prudential Prop. & Cas. Co. v Szeli, 83 NY2d 681, 684 [1994].) The Court also observed that what was required is “a facial comparison of the policy limits” (83 NY2d at 686). Alternatively, “a tortfeasor is ‘underinsured’ if the limits of his or her liability for bodily injury are less than the amount of corresponding insurance purchased by the injured insured.” (S’Dao v National Grange Mut. Ins. Co., 87 NY2d 853, 854 [1995]; see, 70 NY Jur 2d, Insurance, § 1740.) If there are two or more tortfeasors, the insurance policies are not stacked (added together) but are individually compared to the injured insured’s policy. (Id.; Passaro v Metropolitan Prop. & Liab. Ins. Co., 128 Misc 2d 21 [Sup Ct, Queens County 1985], affd on opn below 124 AD2d 647 [2d Dept 1986].)
Section 3420 (f) (2) (A) reads:
“(2) (A) Any such policy shall, at the option of the insured, also provide supplementary uninsured/ underinsured motorists insurance for bodily injury, in an amount up to the bodily injury liability insurance limits of coverage provided under such policy, subject to a maximum of two hundred fifty thousand dollars because of bodily injury to or death of one person in any one accident and, subject to such limit for one person, up to five hundred thousand dollars because of bodily injury to or death of two or more persons in any one accident, or a combined single limit policy of five hundred thousand dollars because of bodily injury to or death of one or more persons in any one accident. Provided however, an insurer issuing such policy, in lieu of offering to the insured the coverages stated above, may provide supplementary uninsured/underinsured motorists insurance for bodily injury, in an amount up to the bodily injury liability insurance limits of coverage provided under such policy, subject to a maximum of one hundred thousand dollars because of bodily injury to or death of one person in any one accident and, subject to such limit for one person, up to three hundred thousand dollars because of bodily injury *564 to or death of two or more persons in any one accident, or a combined single limit policy of three hundred thousand dollars because of bodily injury to or death of one or more persons in any one accident, if such insurer also makes available a personal umbrella policy with liability coverage limits up to at least five hundred thousand dollars which also provides coverage for supplementary uninsured/underinsured motorists claims. Supplementary uninsured/underinsured motorists insurance shall provide coverage, in any state or Canadian province, if the limits of liability under all bodily injury liability bonds and insurance policies of another motor vehicle liable for damages are in a lesser amount than the bodily injury liability insurance limits of coverage provided by such policy. Upon written request by any insured covered by supplemental uninsured/underinsured motorists insurance or his duly authorized representative and upon disclosure by the insured of the insured’s bodily injury and supplemental uninsured/ underinsured motorists insurance coverage limits, the insurer of any other owner or operator of another motor vehicle against which a claim has been made for damages to the insured shall disclose, within forty-five days of the request, the bodily injury liability insurance limits of its coverage provided under the policy or all bodily injury liability bonds. The time of the insured to make any supplementary uninsured/underinsured motorist claim, shall be tolled during the period the insurer of any other owner or operator of another motor vehicle that may be liable for damages to the insured, fails to so disclose its coverage. As a condition precedent to the obligation of the insurer to pay under the supplementary uninsured/underinsured motorists insurance coverage, the limits of liability of all bodily injury liability bonds or insurance policies applicable at the time of the accident shall be exhausted by payment of judgments or settlements.”
Section 3420 (f) (2) (A) requires that once a claim is made against the offending driver, the insurer of that vehicle, upon written demand, has 45 days to disclose “the bodily injury liability insurance limits of its coverage provided under the policy or all bodily injury liability bonds.” The section further *565 provides for a toll during the period the tortfeasor’s insurer fails to disclose its coverage.
The seminal case in providing guidelines for the Court on the timeliness of the notice of an underinsurance claim is Matter of Metropolitan Prop. & Cas. Ins. Co. v Mancuso (93 NY2d 487 [1999]). Where, as here, the insurance policy requires notice of the claim “as soon as practicable” the determination is ad hoc, depending upon the particular circumstances of the case. (70A NY Jur 2d, Insurance, §§ 1840-1841.) In Metropolitan Prop. Ins. Co., Judge Rosenblatt spoke for a unanimous bench in determining that in one of the cases presented, where notice had to be given as soon as practicable, the insured made a no-fault claim immediately after the December 1994 accident and commenced a personal injury action against the tortfeasor in January 1996 that was settled during discovery in October 1996, at which time the plaintiffs attorney first learned what the tortfeasor’s policy limits were and filed a claim for underinsurance the next day, the courts below held that the notice was not given as soon as practicable and the Court of Appeals said, “We cannot say they erred as a matter of law” (93 NY2d at 496). It should be noted that it appears that little or no effort was made prior to October 1996 by the insured’s attorney to ascertain the policy limits of the tortfeasor and 22 months from the date of the accident and 10 months from commencement of the action passed before notice of an underinsurance claim was made. (Matter of Nationwide Ins. Co. [DiGioacchino], 255 AD2d 784 [3d Dept 1998].)
At the Court of Appeals, Judge Rosenblatt made the following salient observations:
“Underinsurance coverage is designed to increase the level of protection afforded to policyholders injured by negligent drivers who lack adequate liability insurance. Typically, an underinsurance claim arises when a tortfeasor has insurance that satisfies the minimum legal requirements but is insufficient to provide full compensation to the injured claimant * * *
“As with other types of insurance, underinsurance coverage involves notice provisions that are conditions precedent to the carrier’s liability” (93 NY2d at 492).
With respect to the “as soon as practicable” requirement, the Court said:
“By its very nature the standard contemplates *566 elasticity and a case-by-case inquiry as to whether the timeliness of the notice was reasonable, taking all of the circumstances into account” (93 NY2d at 494).
The Court further noted:
“Indeed, underinsurance analyses are intensely fact specific and therefore particularly well suited for determinations of timeliness of notice on a case-by-case basis” (93 NY2d at 494-495).
The standard, therefore, fixed by the Court was as follows:
“In interpreting the phrase ‘soon as practicable’ in the underinsurance context we hold that the insured must give notice with reasonable promptness after the insured knew or should reasonably have known that the tortfeasor was underinsured. We contemplate an objective standard as to what constitutes reasonable ascertainment.
“The test, however, does not lend itself to mathematic precision. What may be swiftly ascertained in one case may prove difficult and protracted in another. In some instances injuries may manifest themselves immediately; in others, there may be latency. There are also variables in connection with the parties. Sometimes they may be easily identified, located and counted; sometimes not. An underinsurance claim will also turn on the respective levels of policy coverage and degrees of fault of the parties. This assessment may be straightforward and predictable, or it may be elusive or even surprising. Courts will determine whether notice was given as soon as practicable based on circumstances and factors they consider relevant to that determination” (93 NY2d at 495).
Judge Rosenblatt observed that the dynamics of an underinsurance claim consist of many elements, as follows (93 NY2d at 493):
“A claim for underinsurance benefits, however, has a number of conditions along the way. The accident is obviously the first event, considering that if there is no accident, there can be no underinsurance claim. Nevertheless, an accident and a tortfeasor, without more, does not give rise to an underinsurance claim. There may be no such claim unless and until other conditions exist, including not only the injuries but also the insufficiency of the relevant *567 tortfeasor coverage to compensate for them. In Matter of Prudential Prop. & Cas. Co. v Szeli (83 NY2d 681, 684, supra), this Court held that ‘underinsured motorist coverage is triggered when the limit of the insured’s bodily injury liability coverage is greater than the same coverage in the tortfeasor’s policy.’ Even then, however, a claim for underinsurance need not be paid unless and until another ‘condition precedent’ is met, notably that ‘the limits of liability of all bodily injury liability bonds or insurance policies applicable at the time of the accident shall be exhausted by payment of judgments or settlements’ (S’Dao v National Grange Mut. Ins. Co., 87 NY2d 853, 854 [quoting Insurance Law § 3420 (£) (2)]).
“Although in theory most automobile accidents carry a potential claim for underinsurance benefits, it takes time, investigation and analysis to determine whether one will actually result. In the assessment a number of factors come into play, including the seriousness and nature of the insured’s injuries (e.g., Matan v Nationwide Mut. Ins. Co., 243 AD2d 978), the potential liability of multiple parties (e.g., Matter of Allstate Ins. Co. v Sala, 226 AD2d 172) and of course the extent of a tortfeasor’s coverage (e.g., S’Dao v National Grange Mut. Ins. Co., 87 NY2d 853, supra). Because these factors will vary from case to case, so too will the time at which an underinsurance claim becomes reasonably ascertainable. Thus, although coverage is ‘triggered’ when the limit of the insured’s bodily injury coverage is greater than the same coverage in the tortfeasor’s policy, the acquisition of this information, the existence of other conditions and the occurrence of other developments do not always take place at a fixed time.”
It is significant to note that in 1997 (L 1997, ch 547), section 3420 (f) (2) (A) was amended to provide that carriers disclose policy limits within 45 days after a claim and written demand are made and, further, that the time to make a claim for underinsurance is tolled during the period the insurer fails to disclose. This provision was remarked on by the Court but it was not applicable to the facts of the case (93 NY2d at 494-496). Simultaneously, in 1997, the Legislature amended section 2601 (a) of the Insurance Law, by adding paragraph (6), to *568 make it an unfair claim settlement practice to fail to disclose coverage. With respect to the tolling provision, Judge Rosenblatt stated: “The availability of this remedy may be taken as a relevant factor in evaluating the timeliness of an insured’s notice of claim” (93 NY2d at 495-496).
Parenthetically, Metropolitan Prop. Ins. Co. (supra) also stands for the proposition that early notification by way of a no-fault claim is not a substitute for an underinsurance claim. (See also, Matter of Nationwide Mut. Ins. Co. v Wexler, 276 AD2d 490 [2d Dept 2000]; Matter of Nationwide Ins. Co. v Bietsch, 224 AD2d 623 [2d Dept 1996].)
Consequently, the focus of the inquiry in notice of claim of underinsurance matters, whether it involves different levels of coverage or not, is whether the insured exercised due diligence in attempting to ascertain the policy limits of the tortfeasor. (Matter of Nationwide Mut. Ins. Co. v Wexler, supra; Matter of New York Cent. Mut. Fire Ins. Co. [Moore], 280 AD2d 923 [4th Dept 2001]; Witterschein v State Farm Ins. Co., 278 AD2d 317 [2d Dept 2000]; Matter of State Farm Mut. Auto. Ins. Co. [Hernandez], 275 AD2d 989 [4th Dept 2000]; Matter of American Cas. Ins. Co. v Silverman, 271 AD2d 528 [2d Dept 2000].)
At bar, respondent notified petitioner of her potential underinsurance claim nearly 34 months after the accident and 17 months after ascertaining the primary bodily liability limits of the tortfeasor. Nevertheless, it is clear that from the time respondent’s counsel first wrote to the tortfeasor’s insurer on May 8, 1998, until April 20, 1999, when primary policy limits were disclosed, the time for making an underinsurance claim was tolled under section 3240 (f) (2) (A) as respondent’s counsel diligently pursued disclosure of coverage throughout that period.
Condition 11 of the SUM endorsement provides for nonduplication of coverage for “(e) any amounts recovered as bodily injury damages from sources other than motor vehicle bodily injury liability insurance policies or bonds” (11 NYCRR 60-2.3 [fl, condition 11 [e]). In other words, the SUM insurer will not pay the insured where the tortfeasor has an excess policy, to the extent that tortfeasor’s excess carrier pays the insured up to the SUM limits.
Prudence and hindsight would dictate that astute plaintiff’s counsel in underlying actions make the appropriate comparison in light of the primary coverage disclosed and immediately notify the plaintiffs carrier of any potential SUM claim, dependent upon additional coverage or not in excess of the SUM *569 coverage. While the last sentence of section 3420 (f) (2) (A) of the Insurance Law speaks of exhaustion of the limits of all bodily injury liability policies as a condition precedent to pay SUM coverage, the phrase “all bodily injury liability * * * policies” may not include excess policies. (Matter of Matarasso [Continental Cas. Co.], 82 AD2d 861 [2d Dept 1981], affd 56 NY2d 264 [1982].) It may be that any policy excess to the primary policy of the tortfeasor is not a bodily injury liability policy for purposes of comparison (the trigger event) or for purposes of exhaustion pursuant to section 3420 (f) (2) (A) of the Insurance Law. Nevertheless, it is clear that under the appropriate Insurance Department regulations (11 NYCRR 60-2.3 [f], condition 11 [e]) and the language of the SUM endorsement condition 11 (e), the insured’s carrier will not pay for bodily injury damages recovered from excess or umbrella policies. Therefore, while it may appear that the trigger event was the facial comparison of the motor vehicle bodily liability limits of the two policies herein and that any excess or umbrella policy of the tortfeasor will not be used in the comparison (cf. 4 Dunham, New York Insurance Law ch 51 [Jonath Dachs, Esq., Uninsured & Underinsured Motorist Protection], especially at 51-101 to 51-102), the reality of the situation is that an underinsurance claim is not ripe until knowledge of excess coverage is exhausted.
However, respondent’s counsel must still have exercised diligent efforts in ascertaining the existence or not of excess insurance. He is not insulated by a written demand for such information at the outset of a claim or written demand thereafter standing alone as the toll in section 3420 (f) (2) (A) is only “a relevant factor in evaluating the timeliness of an insured’s notice of claim” (Metropolitan Prop. Ins. Co. v Mancuso, 93 NY2d 487, 496, supra). At bar, there appears to be very little activity concerning excess insurance disclosure during the period May 13, 1999 when respondent’s counsel again requested such information in writing and the discussions and correspondence in September 2000 pertaining to such disclosure on the eve of trial.
Realistically, what should respondent’s counsel have done during this period? As counsel to the plaintiff in the underlying action, he moved for partial summary judgment against the Dulaks during this period of time and received a favorable decision dated August 25, 2000 which determined that the Dulaks were solely responsible for the accident. Clearly, respondent’s counsel zealously protected and advanced his *570 client’s interests in the underlying litigation and brought the case to an expeditious conclusion by virtue of his efforts. During the May 1999-September 2000 period, should respondent’s counsel have moved for other relief, such as to compel disclosure, contempt, sanctions and the like, or sought an additional court conference (I assume that at least two other conferences with the Court were held as two or three conferences are the norm in the Supreme Court, Rockland County, in negligence cases)? Anything of such nature that respondent’s counsel did would surely have jeopardized settlement opportunities in the underlying litigation. Recall that defense counsel therein fobbed off the insurance disclosure requests to defendants’ insurance carrier who, in turn, presumably did not know if the Dulaks had excess insurance with other insurers. The record does not disclose if this issue was ever pursued at the pretrial deposition of Maureen Dulak, if such examination was held. It is, however, uncontroverted that respondent’s counsel made “numerous telephone requests” to the carrier and defense counsel throughout this period for the insurance information (Laub affirmation, May 24, 2001, 11 [emphasis in original]).
In light of the fact that petitioner would not honor an underinsurance claim until the question of excess insurance was resolved, the Court finds that respondent’s counsel could rely on his efforts prior to April 20, 1999, and further that his attempts thereafter to secure the necessary information from the Dulaks’ carrier were diligent and sufficient so that the toll in section 3420 (f) (2) (A) remained intact until he notified petitioner in September 2000 about the situation. Accordingly, the petition to stay arbitration is denied.